## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| SCOTT TRAUDT, | ) | |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **CASE NO. 2:24-cv-01360** |
| | ) | |
| | ) | |
| PAUL ATKINS, CHAIRMAN, | ) | |
| SECURITIES AND EXCHANGE | ) | |
| COMMISSION, in his official capacity, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## MOTION TO DISMISS THE FIRST AMENDED PETITION AND SUPPORTING MEMORANDUM OF LAW

Respondent Paul Atkins[1] ("Respondent"), by and through his attorney, Michael P.

Drescher, Acting United States Attorney for the District of Vermont, hereby moves to dismiss

Petitioner Scott Traudt's ("Petitioner's") First Amended Petition for a writ of mandamus

("Petition"), Dkt No. 5, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## INTRODUCTION

Petitioner alleges that he was harmed by the Financial Industry Regulatory Authority's

("FINRA's") December 2022 trading halt on Meta Materials Series A Preferred Shares

("MMTLP") and by the Securities and Exchange Commission's ("SEC" or "Commission")

alleged failure to intervene and require that FINRA re-open trading in MMTLP. To redress this

alleged harm, Petitioner seeks a writ of mandamus compelling Respondent in his official

---

[1] On January 20, 2025, Gary Gensler stepped down as Chairman of the Securities and Exchange
Commission. Pursuant to Fed. R. Civ. Proc. 26(d), the current Chairman, Paul Atkins, has been
automatically substituted as Respondent.

capacity as the Chairman of the SEC to re-open two days of pay-to-close trading for MMTLP in the "Over the Counter" ("OTC") equities market, in an apparent attempt to recreate trading in MMTLP shares as Petitioner supposes it would have unfolded absent FINRA's trading halt. Petitioner maintains he is entitled to this relief despite the cancellation of MMTLP shares over two years ago and without providing a basis for the claim that the Chairman has either the obligation or authority to re-open trading in MMTLP.

The Court should dismiss the Petition, with dismissal appropriate under Rule 12(b)(1) on several grounds. First, Petitioner lacks standing to bring his claim, as neither the Chairman (or the SEC) nor the Court can re-open trading and create the trading situation that Petitioner would like to see. Thus, a ruling in Petitioner's favor could not redress his alleged injuries. Second, a proceeding challenging the lack of a Commission order must proceed only in a court of appeals. Finally, Petitioner does not and cannot identify a waiver of sovereign immunity that would allow the court to exercise jurisdiction.

Even if Petitioner had standing, was proceeding in the proper court, *and* sovereign immunity was waived, dismissal would be appropriate under Rule 12(b)(6) because Petitioner has not shown he has a "clear and indisputable" right to the re-opening of trading. He therefore is not entitled to the "drastic and extraordinary" remedy of mandamus relief. *In re ALBA Petróleos de El Salvador S.E.M. de C.V.*, 82 F.4th 105, 115 (2d Cir. 2023).

## BACKGROUND

### I.    FINRA is a private corporation and a registered national securities association supervised by the SEC.

In the Securities Exchange Act of 1934 ("Exchange Act"), Congress determined that a system of "[s]upervised self-regulation" would allow "the Government to monitor exchange business in the public interest." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware*, 414 U.S.

117, 127-28 (1973). Congress subsequently extended that system of supervised self-regulatory organizations ("SROs") to private "national securities associations" of OTC (or off-exchange) brokers and dealers. *United States v. Nat'l Ass'n of Sec. Dealers, Inc.*, 422 U.S. 694, 700 n.6, 732-33 (1975).

FINRA is a registered national securities association created in 2007 and "is organized as a Delaware nonprofit corporation operated by private individuals and receives no funding from the federal government." *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1321 (D.C. Cir. 2024), *petition for cert. filed*, No. 24-904 (U.S. Feb. 20, 2025). Pet. ¶ 7. As an SRO supervised by the SEC, FINRA promulgates rules for its members (brokers and dealers) to follow but must file with the SEC "copies of any proposed rule or any proposed change" before it can go into effect. 15 U.S.C. § 78o-3(b); § 78s(b)(1). The SEC generally provides public notice of FINRA's proposal and seeks public comment. *Id*. With some exceptions not applicable here, the SEC then reviews the proposal for consistency with the Exchange Act and related regulations and determines whether to approve or disapprove the proposal. *Id*. § 78s(b)(2). Relevant Exchange Act requirements include that FINRA's rules be designed, among other things, "to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, … and, in general, to protect investors and the public interest." *Id*. § 78o-3(b)(6).

FINRA Rule 6440(a)(3) allows FINRA to halt trading in an OTC security if it "determines that an extraordinary event has occurred or is ongoing that has had a material effect on the market for the OTC Equity Security . . . or has caused or has the potential to cause major disruption to the marketplace or significant uncertainty in the settlement and clearance process." https://www.finra.org/rules-guidance/rulebooks/finra-rules/6440-0; *see also* Pet. ¶ 53 (FINRA issues an "extraordinary event" trading halt under Rule 6440(a)(3) when "FINRA determines, in

its discretion, based on the facts and circumstances of the particular event, that halting trading in the security is the appropriate mechanism to protect investors and ensure a fair and orderly marketplace"). Petitioner alleges that a halt issued under FINRA Rule 6440(a)(3) is not "subject to appeal and there is limited precedent for such actions being overturned." Pet. ¶ 11.

## II.    History of MMTLP shares

Petitioner alleges that, on or about June 28, 2021, Meta Materials, Inc. and Torchlight Energy Resources, Inc. merged. Pet. ¶ 16. As a result of the merger, Series A Preferred Shares, designated as MMTLP, were issued as a dividend to Torchlight shareholders. *Id.* ¶ 14. MMTLP began trading in the OTC market on October 6, 2021. *Id.* ¶ 18. The "OTC market differs from a traditional stock market like the New York Stock Exchange. The OTC is decentralized and 'essentially anonymous.'" *HPIL Hold., Inc. v. Haining Zhang*, Case No. 23-CV-12050, 2025 WL 975444, at \*2 n.1 (E.D. Mich. March 31, 2025) (citation omitted). "Due to the very low price, and to the lack of disclosure requirements that are generally applicable to securities listed on national exchanges, penny stocks on the OTC market are typically highly volatile in price and generally illiquid." *Tarpon Bay Part. LLC v. Zerez Hold. Co.*, 79 F.4th 206 (2d Cir. 2023). Courts recognize that "OTC transactions are inherently riskier than those conducted on a regulated exchange." *SEC v. Lee*, 720 F. Supp.2d 305, 316 (S.D.N.Y. 2010).

Petitioner references "NBH" in connection with MMTLP throughout the Petition without explanation. As explained in Next Bridge Hydrocarbons, Inc.'s ("NBH") publicly available S-1 Registration Statement (July 15, 2022) ("Next Bridge S-1"),[2] NBH was a wholly owned

---

[2] *See* Pet. at ¶36 for hyperlink to NBH's S-1 https://www.sec.gov/Archives/edgar/data/1936756/000119312522281275/d302576ds1a.htm. Also, a court may take judicial notice of "public disclosure documents filed with the SEC." *Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000); *Mehedi v. View, Inc.*, Case No. 21-CV-06374-BLF, 2024 WL 3236706, at \*5 (N.D. Cal. June 28, 2024).

subsidiary of the company created by the merger of Meta Materials, Inc. and Torchlight Energy Resources, Inc.  On or about July 15, 2022, NBH registered shares with the SEC and announced that it would be spun-off as an independent entity and "MMTLP shares [would] transition to NBH." *Id*. Each shareholder of MMTLP would be entitled to receive one share of NBH in exchange for each share of MMTLP, after which shares of MMTLP would be cancelled as part of the "transition of MMTLP shares to NBH equity." *Id*.

On November 30, 2022, approximately four months after the announcement of the planned NBH spin-off, Petitioner purchased 305 shares of MMTLP. Pet. ¶ 23. A week later, on December 6 and 8, 2022, FINRA issued "Daily List" notices stating that "MMTLP shareholders with settled positions as of 12/12/22 will receive one (1) share of Next Bridge Hydrocarbons, Inc for each (1) share of MMTLP held" and that "[p]urchases of MMTLP executed after 12/8/22 will not receive the distribution." Pet. ¶¶ 29, 39, Appx. D and G. The December 6, 2022 notice stated that the MMTLP symbol would be cancelled on December 13, 2022 and the December 8, 2022 notice stated that the MMTLP symbol would be deleted on December 13, 2022. *Id*.

On December 9, 2022, FINRA issued what is commonly called a "U3" trading halt in MMTLP pursuant to FINRA Rule 6440(a)(3). Pet. ¶¶ 36, 45. The trading halt notice stated that the "trading and quoting halt will end concurrent with the deletion of the [MMTLP] symbol effective Tuesday, December 13, 2022." Pet. ¶ 36. The Trading Halt Notice also quoted NBH's S-1 filing, stating "**immediately after [NBH's] spin-off, all shares of Series A Non-Voting Preferred Stock of Meta shall be cancelled**." *Id*. (emphasis in original). On December 13, 2022, FINRA's trading halt in MMTLP ended concurrently with the issuer's cancellation of the MMTLP shares. *Id.; see also,* FAQ, https://www.finra.org/investors/insights/FAQ-MMTLP-corporate-action-and-trading-halt.

### III.    The Instant Mandamus Petition

The crux of the Petition appears to be the allegation that FINRA "allow[ed] broker-dealers to continue trading and overselling MMTLP shares" and then instituted the December 2022 trading halt "without properly closing out short positions" to "protect the financial interests of its market makers, hedge funds and broker-dealers." Pet. ¶¶ 65, 67. Petitioner alleges that FINRA's trading halt was "tainted" by a conflict of interest because members of the FINRA committee that issued the U3 halt had ties to "major broker-dealers with significant exposure to MMTLP short positions." Pet. ¶ 69. Petitioner describes the MMTLP trading halt as "indefinite" and alleges that it has been effect for two years. Pet.¶ 66.[3]

Petitioner seeks a writ of mandamus compelling the Chairman of the SEC to "restart trading in MMTLP for two days" because "FINRA's U3 trading halt on MMTLP was not validated under federal securities laws and has persisted beyond the allowable period under 15 USC § 781(k)." Pet. at 28. Petitioner's request for relief outlines eleven actions that he wants the Court to take to further reopen trading, including "provid[ing] for the migration of MMTLP and NBH shares (as they are one in the same) back into their original broker-dealer accounts" and "set[ting] fourteen days prior to trading that brokers are to report aggregate long and short positions that they hold for their clients, which will then be cross referenced with the Consolidated Audit Trail and the bluesheets for accuracy." Pet. at 42-43. In addition to general complaints about FINRA's treatment of short positions, Petitioner claims that a writ of mandamus is warranted because the SEC's failure to review and reverse FINRA's alleged

---

[3] Petitioner's unsupported assertion that the MMTLP trade halt continued after December 13, 2022 is contradicted by the MMTLP trading halt notice Petitioner included in his Petition. That notice states that the trading halt in MMTLP shares "will end" concurrently with the cancellation of the MMTLP shares on December 13, 2022. Pet. ¶ 36.

"indefinite" trading halt in MMTLP shares violates the APA (Pet. at 29-34) and the nondelegation doctrine as well as the Appointments Clause of the U.S. Constitution (Pet. at 35-39). Petitioner also claims that FINRA's MMTLP trading halt was an unconstitutional taking under the Fifth and Fourteenth Amendments to the U.S. Constitution. Pet. at 40-41.

## LEGAL STANDARD

### I.    Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1)

On a Rule 12(b)(1) motion to dismiss, the party bringing the case bears the burden of establishing by a preponderance of the evidence that the court has jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). For the purposes of a Rule 12(b)(1) motion, defendants can argue that the alleged facts, taken as true, are insufficient to establish jurisdiction. *See, e.g., Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). A Rule 12(b)(1) motion may also challenge the accuracy of the Petitioners' factual allegations. *Id*. "Notwithstanding the liberal pleading standards afforded [self-represented] litigants, federal courts are courts of limited jurisdiction and may not preside over cases if they lack subject matter jurisdiction." *Golrick v. Nationstar Mortgage, LLC,* 2023 WL 8890839, *2 (D.Vt. 2023) (*citing Jiles v. Rochester Genesee Reg'l Transp. Auth.*, 317 F. Supp. 3d 695, 700 (W.D.N.Y. 2018)).

### II.    Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion to dismiss assesses the sufficiency of a complaint, testing whether the person bringing the case has pled sufficient facts to state a claim that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). While courts accept as true all "well-pleaded facts," *id*., they do not accept threadbare recitals of the elements of a cause of action or conclusory allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Golden v. Mgmt*

*and Training Corp.*, 266 F.Supp.3d 277, 281 (D.D.C. 2017) (*citing Twombly*, 550 U.S. at 555) (court need not accept a plaintiff's legal conclusions as true, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations). In deciding a 12(b)(6) motion to dismiss, a court may permissibly consider "documents incorporated into the complaint by reference and matters of which a court may take judicial notice," such as public records. *Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021).

The plausibility standard requires that the person bringing the case show more than "a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id*. (citations omitted). Alleged claims have facial plausibility only "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.; see also Costabile v. N.Y.C. Health & Hosps. Corp.,* 951 F.3d 77, 80-81 (2d Cir. 2020) (explaining self-represented litigants must satisfy the plausibility standard).

## ARGUMENT

I.  **The Petition should be dismissed for lack of subject matter jurisdiction because Petitioner lacks standing, it was filed in the wrong court, and it is barred by the doctrine of sovereign immunity.**

    A.  **Petitioner lacks standing because the SEC did not cause his alleged injuries and a ruling in his favor would not redress them.**

This Court lacks jurisdiction because Petitioner has not established Article III standing. "To establish standing, a plaintiff must show an injury in fact caused by the defendant and redressable by a court order." *United States v. Texas*, 599 U.S. 670, 676 (2023); *California v. Texas*, 593 U.S. 659, 668-69 (2021) (plaintiffs bear the burden to plausibly allege each of these elements). "The second and third standing requirements—causation and redressability—are often

flip sides of the same coin." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381. The converse is also true. To establish causation, a plaintiff must show that his injury is "fairly traceable to the challenged action." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (cleaned up).

"[W]hen (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of *someone else*, standing is not precluded, but it is substantially more difficult to establish. That is often because unregulated parties may have more difficulty establishing causation—that is, linking their asserted injuries to the government's regulation (or lack of regulation) of someone else." *All. for Hippocratic Med.*, 602 U.S. at 382 (cleaned up) (emphasis in original). "The causation requirement precludes speculative links—that is, where it is not sufficiently predictable how third parties would react to government action or cause downstream injury to plaintiffs." *Id.* at 383. "The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing." *Id.*

Petitioner cannot show that the Commission's failure to overturn the FINRA trading halt caused his injuries. Even if the Commission had overturned the trading halt in December 2022, it is entirely speculative whether Petitioner would have avoided the economic loss he now alleges. First, even if the Commission had immediately cancelled the halt, Petitioner would have been able to sell his shares without losing the money he claims he has lost *if, and only if*, another party were willing to purchase them at the price he seeks.[4] Second, even if Petitioner found a willing

---

[4] A purchaser of MMTLP on or after December 9, 2022 would *not* have been eligible to receive NBH shares in exchange for this MMTLP shares, but the MMTLP shares he just purchased would be canceled on December 13. To the extent Plaintiff claims that short sellers would have

buyer, it is unclear whether or how any such trades would have settled. Third, to the extent

Petitioner complains about his inability to sell his NBH shares, he does not allege that the trading

halt, or the Commission's alleged inaction regarding the halt, applies to trading in NBH shares.

Examining the other side of the coin—redressability—confirms that Petitioner lacks

standing. This court cannot grant the relief Petitioner seeks. It is not clear how the SEC would

resurrect MMTLP shares that were cancelled by the issuer over two years ago. Even if that were

possible, the Commission alone cannot "reopen[] two days of pay-to-close trading" for

resurrected MMTLP shares. As Petitioner's complex request for relief shows, the involvement of

many other persons (a Special Master, EQ Shareowner Services, all brokers who held long or

short positions in MMTLP for their clients, the Depository Trust Clearing Corporation, Charles

Schwab and Co. Inc. and other broker-dealers listed with FINRA, and FINRA) would need to

play roles in facilitating the trading in MMTLP shares as requested by Petitioner. Pet. at 42-44.

In addition, even with the involvement of all those persons or entities, it is entirely speculative,

and in fact highly unlikely, that reopening trading would allow Petitioner to sell his shares at a

profit. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal

court; that is the very essence of the redressability requirement." *Steel Co. v. Citizens for a Better

Environment*, 523 U.S. 83, 107(1998); *see also Tex. Voters All. v. Dallas Cnty.*, 495 F. Supp. 3d

441, 456 (E.D. Tex. 2020) (finding no standing where "the Court is unable to grant relief that

would effectively redress the alleged injury Plaintiffs claim to suffer").

Finally, even if an order compelling the Commission to reopen trading would address

Petitioner's injuries (and it would not), the present lawsuit is against *only* the Chairman. The

---

been forced to buy his shares, despite the generally unappealing prospect of buying shares that
are about to be canceled, that is purely speculation.

Chairman does not have power to act unilaterally, and any action would require a vote by the majority of the Commissioners. 15 U.S.C. § 78d(a); 17 C.F.R. § 200.41. Accordingly, Petitioner cannot demonstrate that he has the requisite standing to proceed with the Petition, and the Court lacks subject matter jurisdiction.

### B.  Petitioner filed in the wrong court.

Even if Petitioner had standing to bring his petition, he would have had to file it before the Court of Appeals for the Second Circuit. Where appellate courts have been granted exclusive jurisdiction over challenges to a final agency action, mandamus claims can only be heard by the appellate courts. *Telecommunications Research & Action Center v. FCC ("TRAC")*, 750 F. 2d 70, 77 (D.C. Cir. 1984). In *TRAC*, the plaintiff brought a petition against the Federal Communications Commission to compel unreasonably delayed agency action. *Id.* at 72. The Court held "where a statute commits final agency action to review by the Court of Appeals, the appellate court has exclusive jurisdiction to hear suits seeking relief that might affect its future statutory power of review." *Id.* at 72. The Court specifically rejected the argument that the All Writs Act, 28 U.S.C. § 1651(a), and the mandamus statute, 28 U.S.C. § 1361, confer jurisdiction on the district court, stating that because "the District Court has no present or future jurisdiction over agency actions assigned by statute to appellate court review, it can contemplate no exercise of jurisdiction that mandamus might aid." *Id.* at 77.

Petitioner contends that the Commission has an obligation to issue an order re-opening MMTLP trading. Any such order would be issued under the Exchange Act, and Section 25(a) of the Exchange Act provides appellate courts with exclusive jurisdiction over review of such orders. 15 U.S.C. § 78y; *SEC v. Jett*, 514 F. Supp. 2d 532, 535 (S.D.N.Y. 2007) (Section 25(a) of the Exchange Act "confers exclusive jurisdiction on the Court of Appeals to review the merits of

a Commission order"). That Petitioner challenges inaction by the Commission rather than a final

order does not remove the claim from the exclusive jurisdiction of the Court of Appeals. *See*,

*e.g*., *Silberstein v. U.S. Sec.*, 153 F. Supp. 3d 233, 238 (D.D.C. 2016) (holding that under the

*TRAC* analysis, Section 25(a) applies to claims of unreasonable delay and thus the district court

lacked jurisdiction).

### C. Petitioner's claim is barred by sovereign immunity.

Finally, the United States, "as sovereign, is immune from suit save as it consents to be

sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to

entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted). That

is, consent to suit is a prerequisite to subject matter jurisdiction over a claim against the United

States, its agencies, and officials. *See United States v. Orleans*, 425 U.S. 807, 814 (1976).

"Without a waiver of sovereign immunity, a court is without subject matter jurisdiction over

claims against federal agencies or officials in their official capacities." *Treasurer of NJ v. U.S.*

*Dep't of the Treasury*, 684 F.3d 382, 395 (3d Cir. 2012). Such a waiver "must be express and

unambiguous to confer subject matter jurisdiction on a court." *Id.* at 396.

### 1. The mandamus statute does not waive sovereign immunity.

"Courts have held that the federal mandamus statute, 28 U.S.C. § 1361, does not by itself

operate as a waiver of sovereign immunity." *Veale v. U.S.*, Case No. 05-CV-104, 2006 WL

751242, at *3 (D. Vt. Mar. 10, 2006); *see also Doe v. Civiletti*, 635 F.2d 88, 94 (2d Cir. 1980)

("Nor is the mandamus statute an all-purpose waiver of the Government's immunity from suit.").

While a plaintiff can proceed against a public official under the mandamus statute without a

waiver of sovereign immunity if "a plaintiff . . . demonstrate[s] that the United States owed him a

duty, which the defendant official failed to perform," *Veale*, 2006 WL 751242, at *3, as

explained below, Petitioner does not and cannot meet that burden.

### 2. The Administrative Procedure Act ("APA") does not waive sovereign immunity in this case.

To rely on the APA's waiver of sovereign immunity, Petitioner must allege he suffered a legal wrong because of an agency action (or failure to act) or that he was adversely affected or aggrieved by an agency action (or failure to act) within the meaning of a relevant statute. 5 U.S.C. § 702; *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970); *Sprecher v. Graber*, 716 F.2d 968, 974 (2d Cir. 1983). A "failure to act" is "properly understood as a failure to take an *agency action*—that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13)." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (emphasis in original). Under 5 U.S.C. § 551(13) an agency action is "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."

While Petitioner acknowledges that "the APA may not apply to" his claims against the SEC, Pet. at 29, Petitioner nevertheless argues that "[t]he SEC has acted arbitrarily and capriciously under 5 U.S.C. § 706(2) by refusing to restart trading." Pet at ¶ 52 and at 29. Because Petitioner is seeking to compel agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1), Pet. at 30, he must allege that the SEC "failed to take a *discrete* agency action that it is *required to take.*" *Harrison Cnty, Miss. v. U.S. Army Corps of Engins.*, 63 F.4th 458, 463 (5th Cir. 2023) (citing *Norton*, 542 U.S. at 64) (emphasis in original).[5] Petitioner cannot rely on the

---

[5] There remains some uncertainty within the Second Circuit "whether the APA threshold limitations are truly jurisdictional or are rather essential elements of the APA claims for relief." *Machanda v. Lewis*, No. 21-1088-CV, 2021 WL 5986877, at *5 n.4 (2d Cir. Dec. 2021) (cleaned up). *See also Pearl River Union Free Sch. Dist. v. King*, 214 F. Supp. 3d 241, 251 (S.D.N.Y. 2016) (analyzing the finality requirement under Rule 12(b)(6) because the court considered it "not jurisdictional in nature, but rather an element of a claim for relief under the APA," but analyzing

APA's waiver of sovereign immunity because Petitioner has cited no statute or regulation that requires the SEC to review a FINRA trading halt of an OTC security or to re-start trading in an OTC security subject to such a trading halt. Neither the allegation that the SEC "never reviewed or validated the U3 trade halt," Pet. ¶ 52, nor the allegation that the SEC "unreasonabl[y] delay[ed] in restarting trading," Pet. at 29, identifies a *discrete* agency action the Commission was *required* to take. *See Harrison Cnty.*, 63 F.4th at 466 ("Because the Corps has no duty to prepare the supplemental EIS the plaintiffs seek, the plaintiffs have no APA claim for unlawful agency inaction, and the Corps is immune from their suit claiming otherwise.").

Moreover, the APA's waiver of sovereign immunity does not apply to "agency action committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (agency action is not subject to judicial review "to the extent that" such action "is committed to agency discretion by law."). Petitioner alleges that the SEC violated the APA because the SEC "never reviewed or validated" FINRA's U3 trading halt in MMTLP shares. Pet. ¶¶ 52, 55. Petitioner has not identified which Exchange Act provision or regulation he claims the SEC should have invoked to review and reverse a trading halt of an OTC security imposed by FINRA under Rule 6440, but the use of any such mechanism would have been subject to the Commission's discretion. To the extent Petitioner claims the SEC should have invoked Section 19 of the Exchange Act, 15 U.S.C. § 78s(h)(1) "to censure or impose limitations upon the

---

arguments under § 701(a)(2) under Rule 12(b)(1) because the court "cannot exercise subject-matter jurisdiction if § 701(a)(2) precludes judicial review of the relevant decision under the APA") (citation omitted). Ultimately, this distinction is irrelevant here because dismissal would be appropriate under either Rule 12(b)(1) or 12(b)(6). *See, e.g., Westchester v. U.S. Dep't of Housing Urban Dev.*, 778 F.3d 412, 416 n.5 (2d Cir. 2015) ("The district court properly concluded that this distinction did not affect its disposition of HUD's motion, which sought dismissal of the County's complaint pursuant to both Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.").

activities, functions, and operations of" FINRA, the determination whether the Commission

should take an action against an SRO under Section 19 "rests within the sound discretion of the

agency." *See San Francisco Min. Ex. v. SEC*, 378 F.2d 162, 165 (9th Cir. 1967).[6] Likewise, to

the extent Petitioner claims the Commission should have undertaken some investigation or action

pursuant to 15 U.S.C. § 78u, the decision to do so would be subject to Commission discretion.

*See Heckler v. Chaney,* 470 U.S. 821, 832 (1985) (holding "an agency's decision not to take

enforcement action should be presumed immune from judicial review under § 701(a)(2)"); *SEC*

*v. Jerry T. O'Brien*, *Inc.*, 467 U.S. 735, 745 (1984) ("Congress intended to vest the SEC with

considerable discretion in determining when and how to investigate possible violations of the

statutes administered by the Commission").

### 3. The other statutes cited by Petitioner are unavailing.

In addition to the mandamus act and the APA, Petitioner appears to bring his claims

under the Exchange Act and the federal question statute at 28 U.S.C. § 1331. Neither statute

expressly and unambiguously waives the SEC's sovereign immunity such that he may proceed in

the instant court.  *See* 15 U.S.C. § 78y (permitting suit to challenge Commission final orders but

vesting that power exclusively with the circuit courts of appeals); *M.G. Davis & Co. v. SEC,* 252

F. Supp. 402, 403 (S.D.N.Y. 1966) ("'As distinguished from having its orders reviewed by the

courts, Congress has not consented that the Commission be sued.'") (*quoting Holmes v. Eddy*,

---

[6] *See also Alpine Sec. Corp. v. NSCC*, Case No. 23-CV-00782-JNP-JCB, 2025 WL 901847, at *2
(D. Utah March 25, 2025) (the "SEC *may* limit a clearing agency's activities and operations or
suspend or revoke its registration 'if in [the SEC's] *opinion* such action is necessary or
appropriate in the public interest") (citing 15 U.S.C. § 78s(h)(1) (emphasis added); *Opulent Fund
v. Nasdaq Stock Mkt., Inc.*, Case No. C-07-03683 RMW, 2007 WL 3010573, at *6 (N.D. Cal.
Oct. 12, 2007) (stating that § 78s(h)(1) "*permit[s]* the SEC to suspend, censure or impose other
limits on an SRO for violating the Exchange Act, rules or regulations thereunder, or the SRO's
own rules") (emphasis added).

341 F.2d 477, 480 (4th Cir.), cert. denied 382 U.S. 892 (1965)); *Neighbors for Rational Dev., Inc. v. Norton*, 379 F.3d 956, 960-61 (10th Cir. 2004) (section 1331 does not waive the government's sovereign immunity); *Randall v. United States*, 95 F.3d 339, 345 (4th Cir. 1996) (the general federal question jurisdiction statute is not a waiver of sovereign immunity but merely establishes, a subject matter that is within the competence of federal courts to entertain). As such, because Petitioner's suit is against the government and he has failed to plead a claim under a statute specifically waiving the government's sovereign immunity, the Petition should be dismissed for lack of jurisdiction under Rule 12(b)(1).

## II.    Even if the Court had jurisdiction, Petitioner's mandamus petition should be dismissed for failure to state a claim under Rule 12(b)(6) because Petitioner does not state a claim for relief under the federal mandamus statute.

"[M]andamus is an extraordinary remedy, intended to aid only those parties to whom an official or agency owes a clear nondiscretionary duty. A party who seeks a writ of mandamus must show a clear and indisputable right to its issuance." *Escaler v. USCIS*, 582 F.3d 288, 292 (2d Cir. 2009). A district court's power to compel official action by mandamus is limited to the enforcement of plainly defined, purely ministerial, nondiscretionary duties. *See Decatur v. Paulding*, 39 U.S. 497, 514-17 (1840); *Wilbur v. United States*, 281 U.S. 206, 218 (1930). A duty qualifies as "ministerial" only when it "is so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur*, 281 U.S. at 218. The party seeking mandamus relief has the burden of showing that its right to the writ is "clear and indisputable." *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002). If the action Petitioner seeks to compel is discretionary, there is no clear right to relief and mandamus is not an appropriate remedy. *See, e.g., Heckler v. Ringer,* 466 U.S. 602, 616 (1984).

While Petitioner alleges that the "SEC Chairman [] has a non-discretionary duty to restart

16

trading in MMTLP for two days," he does not offer any allegations supporting this assertion. Pet. at 28. In particular, he does not and cannot identify any duty on the part of the SEC, let alone a single member of the Commission, to review FINRA's U3 trading halt or to order reopening trading in MMTLP shares. Petitioner's allegation that "the SEC violated its duty to protect investors and ensure fair and orderly markets under the Securities Exchange Act by permitting FINRA's unsupported and indefinite halt" does not meet his burden to show that Petitioner has a "clear and indisputable" right to the relief he seeks. Pet. at 29; *Power*, 292 F.3d at 784.

A fundamental issue with Petitioner's claim is that it is premised on the existence of an indefinite trading halt – an allegation that is contradicted by the evidence Petitioner submitted as part of his Petition. As FINRA's MMTLP trading halt notice made clear, the December 9, 2022 MMTLP trading halt ended concurrently with the cancellation of MMTLP shares by the issuer on December 13, 2022. Pet. ¶ 36. Because the trading halt lasted only four days, Petitioner's efforts to find a non-discretionary duty in *SEC v. Sloan*, 436 U.S. 103, 111 (1978), are baseless. *See* Pet. at 28 ("FINRA's practice of sequential trading halts under Rule 6440(a)(3) is inconsistent with [*Sloan*] and the SEC's statutory mandate."); Pet. at 41 (the "U.S. Supreme Court holdings in *Sloan* . . . confirm a non-discretionary duty statutorily mandated at the SEC's 12(k) trade halt rule enacted by Congress."). In *Sloan*, the Court held that because Section 12(k) of the Exchange Act, 15 U.S.C. § 78l(k), authorizes the SEC "summarily to suspend trading in any security . . . *for a period not exceeding ten days*," the SEC is not "statutorily authorized to issue a series of summary suspension orders based upon a single set of events or circumstances." 436 U.S. at 111 (1978) (emphasis in original). Even assuming that *Sloan* applies to FINRA trading halts, which are not issued under Section 12(k), it is not necessary to address whether

*Sloan* could impact extensions of FINRA trading halts because FINRA never entered an extension of the trading halt in MMTLP shares.

In addition to having no basis in *Sloan* for finding a duty that could support a mandamus claim, none of the other authorities Petitioner points to establish "a clear nondiscretionary duty" on the part of the SEC to either review FINRA's trading halt for compliance with the securities laws or reopen trading in MMTLP shares. *Escaler*, 582 F.3d at 292. Petitioner discusses the APA, the nondelegation doctrine, the Appointments Clause, and the takings clause of the Fifth Amendment, but none of those address how the agency should respond to a FINRA trading halt or impose any duties that have any relevance to the situation. With respect to the APA, Petitioner alleges that the "SEC's 2 year hiatus from addressing the U3 halt in MMTLP is clearly and [sic] unreasonable delay" under 5 U.S.C. § 706(1), Pet. at 30-34, but section 706(1) gives courts authority to "compel agency action unlawfully withheld or unreasonably delayed" and does not impose any duty on the SEC to address a FINRA trading halt. Also, Petitioner's reliance on *TRAC*, 750 F. 2d 70, to support his allegation that the SEC unreasonably delayed agency action is misplaced. As discussed above, *TRAC* holds that appellate courts have exclusive jurisdiction to hear claims like those brought by Petitioner but never reached the merits of the unreasonable delay claim. *Id.* at 80.

With respect to the nondelegation doctrine, Petitioner relies on *Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1327 (D.C. Cir. 2024), to argue that because FINRA's MMTLP U3 trading halt was "never validated by the SEC," it "clearly ran afoul of the nondelegation doctrine," but he points to no way in which the nondelegation doctrine could impose on the SEC a clear duty to act, so his arguments based on *Alpine* are irrelevant to the claim he states.[7] The

---

[7] In *Alpine*, the court found that "expulsions imposed through FINRA's expedited proceedings"

Appointments Clause is similarly entirely irrelevant to Petitioner's mandamus claim as Petitioner's sole allegations regarding his claim under the Appointments Clause are that there are "Appointments Clause violations in evidence during the … U3 trade halt" and there is "no Appointments Clause safety for FINRA in the U3 halt decision." Pet at 35, 39. The Appointments Clause plainly does not address the SEC's duties regarding FINRA trading halts. Finally, Petitioner's takings claim does not even address any action or inaction by the SEC as it is based exclusively on the allegation that "FINRA's actions were a taking without just compensation." Pet. at 40.[8]

Because the Petition does not and cannot allege that Petitioner has a clear right to relief from either the Respondent or the SEC, mandamus is not an available remedy. *Power*, 292 F.3d at 784. Thus, the Petition should be dismissed for failure to state a claim upon which relief can be granted.

---

likely violated the nondelegation doctrine and explained that unlike other disciplinary actions taken by FINRA, "the SEC does not exercise ultimate control over FINRA's decisions to expel its members in expedited proceedings because those orders take effect immediately, before the SEC can review them." *Alpine*, 121 F.4th at 1326. Plaintiff is not a member of FINRA and has not been disciplined or directed to do (or not do) anything by FINRA.

[8] Because the Petition is limited to seeking mandamus relief, it is not necessary to address the merits of Petitioner's claims of violations of the nondelegation doctrine, the Appointments Clause, or the Fifth Amendment. In any event, these claims lack merit. Numerous courts have found that FINRA's role in assisting the SEC's oversight of the securities markets is constitutionally proper. *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023) (observing that "[i]n case after case, the courts have upheld this arrangement, reasoning that the SEC's ultimate control over the rules and their enforcement makes the SROs permissible aides and advisors"). The Appointments Clause has no relevance here because it does not govern the selection of private executives or board members of an SRO like FINRA. *See, e.g., National Horsemen's Benev. & Protect. Assoc. v. Black*, 107 F.4th 415, 436-37 (5th Cir. 2024) ("Challenges based on private nondelegation, on the one hand, and the Appointments Clause, on the other, appear mutually exclusive. For constitutional purposes, an entity is either governmental or not."). Plaintiff's Fifth Amendment takings clause claim fails because his shares have not been taken by FINRA, let alone by the Commission.

**CONCLUSION**

For the foregoing reasons, the First Amended Petition should be dismissed.


Date: May 2, 2025.                                    Respectfully Submitted,

                                                      UNITED STATES OF AMERICA

                                                      MICHAEL P. DRESCHER
                                                      Acting United States Attorney

                                      By:             *Lauren Almquist Lively*

                                                      Lauren Almquist Lively
                                                      Assistant U.S. Attorney
                                                      P.O. Box 570
                                                      Burlington, VT 05402-0570
                                                      (802) 951-6725
                                                      Lauren.Lively@usdoj.gov