UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

```
*************************************
SCOTT TRAUDT                          *
Traudt                                *
                                      *    Petition: Case No. 2:24-cv-01360-cr
v.                                    *    1st Amended Petition
                                      *
PAUL ATKINS                           *
CHAIRMAN                              *
US SECURITIES AND EXCHANGE            *
COMMISSION                            *
Defendant in his official capacity    *
                                      *
*************************************
```

# MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS AND SEC'S OPPOSITION TO TRANSFER

**Preliminary Statement**

Plaintiff respectfully opposes both the Securities and Exchange Commission's motion to dismiss and its opposition to transfer. Plaintiff filed in this Court a single mandamus action seeking two forms of non-monetary relief: (1) disclosure of trading records (including blue sheets and Consolidated Audit Trail data) and (2) relief from an unlawful trading halt imposed through FINRA Rule 6440(a)(3). After the Court granted a stay of discovery pending resolution of the motion to dismiss and indicated that jurisdictional issues may foreclose district court review, Plaintiff now requests transfer of the entire matter to the United States Court of Appeals for the Second Circuit under 28 U.S.C. § 1631. Given the urgent need for resolution affecting more than 65,000 investors and nearly $2 billion in losses, transfer—not dismissal—is in the interest of justice.

The SEC has raised sovereign immunity as a defense and for what follows in depth this argument founders on the legal shoals of *SEC v. Sloan*, 436 U.S. 103 (1978), which recognized

simply that trade halts can only last 10 days, and thus the SEC had a caselaw and statutory duty to restart trading within 10 days of the U3 halt in MMTLP. It's been 2.5 years for MMTLP shareholders. And as a simple fallback position, the SEC was grossly negligent for not reviewing the FINRA actions and allowing a prolonged black mark upon the market which has had the effect of raising doubts in the minds of investors that the markets are fairly regulated.

Petitioner meets all three requirements of Article III standing. First, injury-in-fact: Petitioner has suffered a concrete and particularized injury through the loss of property and money tied to his ownership of MMTLP shares, which were rendered untradeable. Second, causation: this injury is directly traceable to the SEC's failure to supervise FINRA and prevent arbitrary and capricious market actions, including the improper halt of trading, which caused Petitioner's losses. Third, redressability: the injury can be remedied by judicial relief because a writ of mandamus may compel the SEC to release the trading data necessary to determine the scope of damages suffered by Petitioner and over 65,000 other shareholders, and a court order may direct the SEC to exercise its authority under Rule 12k-2 to resume trading, thereby mitigating Petitioner's damages.[1]

---

[1] Section 12(k)(2) of the Securities Exchange Act of 1934 grants the Commission broad emergency authority to "summarily take such action … as it determines is necessary to maintain or restore fair and orderly securities markets." 15 U.S.C. § 78l(k)(2). This power is not limited to halting trading; it extends to altering, supplementing, suspending, or imposing requirements or restrictions across the securities markets whenever necessary to protect investors and preserve market integrity. By contrast, Section 12(k)(1)(A) permits the SEC to suspend trading in a specific non-exempt security for up to ten business days if such action serves the public interest or protects investors. When such a suspension ends, securities listed on a national exchange resume trading automatically, while over-the-counter securities require additional compliance measures, including Rule 15c2-11 and FINRA's Form 211 process, before trading resumes. The Commission has invoked § 12(k)(2) in past crises to both stabilize markets and restore trading activity. Following the September 11, 2001 terrorist attacks, the SEC issued emergency orders under § 12(k)(2) to facilitate the reopening of the American Stock Exchange and ensure market functionality. Similarly, during the 2008 financial crisis, the Commission exercised its § 12(k)(2) authority to impose emergency restrictions on abusive short-selling practices while at the same

2

**Part I. Section 1631 Requires Transfer, Not Dismissal**

Congress directed in 28 U.S.C. § 1631 that "[w]henever a civil action is filed in a court … and that court finds that there is a want of jurisdiction, the court shall, if it is in the interest of justice, transfer such action … to any other such court … in which the action … could have been brought at the time it was filed." The Second Circuit enforces this command strictly. In *Paul v. INS*, 348 F.3d 43 (2d Cir. 2003), the court explained: "Whenever a civil action or appeal, including a petition for review of administrative action such as Paul's petition for review of the BIA decision, is filed in a court that lacks jurisdiction to review it, the court in which the action or appeal was filed shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed, and the action or appeal shall proceed as if it had been filed in or noticed for the court to which it is transferred on the date upon which it was actually filed in or noticed for the court from which it is transferred. *Paul* at 46.

The law was passed top aid litigants who were confused as to forum choice, and in this matter Plaintiff believed he was supposed to commence hostilities in US District Court, Burlington, Vermont. Congress envisioned issues on forum selection: "In *Liriano v. United States*, 95 F.3d 119 (2d Cir. 1996), we reviewed the legislative history of § 1631 and found that Congress intended the provision to aid litigants who were confused as to the proper forum for review." Id. at 122. Cited by *Paul* at 46.

---

time taking measures to allow trading to continue under orderly conditions. These precedents demonstrate that § 12(k)(2) equips the SEC not merely with the authority to suspend trading, but also with the affirmative power to resume and stabilize trading when necessary to protect investors and ensure orderly markets.

Similarly, in *De Ping Wang v. Dep't of Homeland Security*, 484 F.3d 615 (2d Cir. 2007), the court underscored: If an action or appeal is mistakenly filed in the wrong court, § 1631 permits the court in which the action is filed, in the interest of justice, [to] transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed. 28 U.S.C. § 1631. In *Paul v. INS*, 348 F.3d 43 (2d Cir. 2003), we held that § 1631 required a district court to transfer to this Court a petition for review that was mistakenly, but timely, filed in the district court. See Id. at 46-47.

The SEC's litigation posture illustrates precisely why Congress enacted § 1631. It first argued that this Court lacks jurisdiction, leading the Court to stay discovery. Now, it opposes transfer to the Second Circuit—the very forum it implied was proper. Courts reject such contradictions. As the Supreme Court made clear: "Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

Moreover, Plaintiff's mandamus petition was structured with restraint. The first relief sought was disclosure of trading records; only after transparency was achieved would trading relief be pursued.[2] This sequencing aligns with *Natural Resources Defense Council, Inc. v. Food*

---

[2] The clearest evidence that the trading in MMTLP was halted with proof that the share counts and short positions were unclosed was that the Continuous Net Settlement (CNS) system which is a stock broker to stock broker system precluded getting final position numbers because the brokers in that system don't have to report short positions and also because it is on the OOTC-UTP (a FINRA "internal" transfer medium that Traudt posits is not provided for statutorily in FINRA at all); in essence, the Depository Trust Clearing Corp. and the National Securities Clearing Corp. both have accurate trading numbers and could confirm exactly what happened to the MMTLP shares and as of the U3 halt how many short and long positions existed. The numbers have been buried by FINRA and the SEC. One phone call from the SEC's Office of General Counsel could get those numbers and make it public…why the 2.5 yearlong refusal to produce trading numbers?

4

*& Drug Admin.*, 710 F.3d 71, 76 (2d Cir. 2013), where the court emphasized: "5 U.S.C.S. § 555(b) requires an agency to proceed to conclude a matter presented to it within a reasonable time. 5 U.S.C.S. § 702 states that a person adversely affected or aggrieved by agency action is entitled to judicial review thereof. 5 U.S.C.S. § 551(13) defines agency action to include failure to act. 5 U.S.C.S. § 701(a)(2) precludes judicial review of agency action committed to agency discretion by law."[3]

**Part II. Velocity of Litigation, Judicial Economy, and Jurisdictional Signals Require Consolidation in the Second Circuit**

The Court's stay order and observations about jurisdiction signal that appellate jurisdiction may be proper. To avoid delay, transfer is the only efficient course. As *Paul* held, "Section 1631 requires transfer … [and] the district court abused its discretion by dismissing rather than transferring the petition." 348 F.3d at 47. And in *De Ping Wang*, the Second Circuit

---

[3] Courts evaluate whether agency delay is "unreasonable" under the six TRAC factors, adopted by the D.C. Circuit in *Telecommunications Research & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70, 80 (D.C. Cir. 1984), and expressly applied by the Second Circuit in *Natural Resources Defense Council, Inc. v. FDA*, 710 F.3d 71, 84 (2d Cir. 2013). The factors are:

1. "The time agencies take to make decisions must be governed by a 'rule of reason.'"
2. "Where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed, that statutory scheme may supply content for this rule of reason."
3. "Delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake."
4. "The court should consider the effect of expediting delayed action on agency activities of a higher or competing priority."
5. "The court should also take into account the nature and extent of the interests prejudiced by delay."
6. "The court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed." *NRDC v. FDA*, 710 F.3d at 84 (quoting *TRAC*, 750 F.2d at 80).

reiterated that "transfer, rather than dismissal, is particularly appropriate where … the procedural posture makes dismissal especially harsh."

Consolidation in the court of appeals also aligns with *Telecommunications Research & Action Ctr. v. FCC (TRAC)*, 750 F.2d 70 (D.C. Cir. 1984): "Where a statute commits final agency action to review by the Court of Appeals, a suit seeking relief that might affect the court's future jurisdiction is subject to the exclusive review of the Court of Appeals." Id. at 75.

Moreover, it is in the interests of judicial economy to transfer this case to the Second Circuit.

**Part III. *Sloan:* SEC's Statutory Limit Is Ten Days**

The Exchange Act authorizes only temporary suspensions: "The Commission may summarily suspend trading in any security … for a period not exceeding ten days." 15 U.S.C. § 78l(k)(1). In *SEC v. Sloan*, 436 U.S. 103 (1978), the Court held: "The statute plainly authorizes a suspension for a period not exceeding 10 days." Id. at 112. It further declared: "The Commission's practice of issuing successive 10-day suspension orders, without new findings or new evidence, is not authorized by the Act." Id. at 113. "The Commission's reading would in effect permit indefinite suspensions of trading … a result that Congress quite clearly did not intend." Id. at 114.

If the SEC itself cannot suspend indefinitely, then FINRA—an SRO—cannot achieve the same result under Rule 6440(a)(3). "In view of congressional recognition in other sections of the Act that any long-term sanctions or continuation of summary restrictions must be accompanied by notice and an opportunity for a hearing, the absence of any provision in § 12(k) for extending summary suspensions beyond the initial 10-day period must be taken as a clear indication that extended summary restrictions are not authorized under § 12(k)." *Sloan* at 112–14.

And of particular application to the MMTLP shareholders' situation, "Though the Commission contends that the suspension of trading is necessary for the dissemination in the marketplace of information about manipulative schemes, the Commission is at liberty to reveal such information at the end of the 10-day period and let investors make their own judgments." *Sloan* at 115–16. The SEC should have explained the halt. They did not. FINRA has already been discredited for its rationale.

**Part IV. Fifth Circuit Precedent, the APA, and Constitutional Constraints**

The Administrative Procedures Act (APA 5 USCS 551 et. seq.) requires courts to set aside agency actions that are "arbitrary [or] capricious." 5 U.S.C. § 706(2)(A). In *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983), the Court explained: "An agency rule would be arbitrary and capricious if the agency … entirely failed to consider an important aspect of the problem." Id. at 43.

That flaw is present here. FINRA's invocation of Rule 6440(a)(3) produced a two-year freeze followed by cancellation of the security—an outcome it plainly never modeled.

The Fifth Circuit in *National Ass'n of Private Fund Managers v. SEC*, No. 23-60626 (5th Cir. Aug. 25, 2025), rejected this exact type of omission: "The Commission acted arbitrarily and capriciously by evaluating the two rules in isolation. The APA required it to assess their cumulative economic impact, which the SEC wholly failed to do." Slip op. at 17–18. "When an agency action carries significant economic consequences, failure to assess those consequences is fatal to the rule." Id. at 22. the SEC "failed fully to assess the economic impact of the two Rules" as required, citing precedents like *Chamber of Commerce v. SEC*, 412 F.3d 133 (D.C. Cir. 2005), which emphasizes determining "the economic implications of the rule." The court deems this

omission sufficient to grant review in part and remand, effectively making the failure "fatal" to the rules as promulgated.

Plaintiff posits that there was no way on God's green earth that the SEC and FINRA accurately modeled anything remotely like the U3 halt that hit MMTLP in that:

1. There was over $2 billion wiped from the books of MMTLP shareholders.

2. Members of FINRA's Uniform practices Committee (UPC) that took part in the U3 Halt were in at least 5 of the 13 members of that committee members of brokerages or investment groups that held MMTLP and whether or not they were short or long at their companies was never disclosed (a failure of the SEC here to stop conflicts of interest and insider trading).

3. Over 65,000 shareholders lost their investments.

4. The 2.5 year halt is unheard of.

5. The ticker MMTLP was "cancelled" during the halt despite CUSIP #'s for it still populating accounts to this day.

6. The SEC never followed up on the swap of MMTLP shares as 1 for 1 into Next Bridge Hydrocarbons Inc. to see if the transfer agent (Equinity) actually had been filled with all of the approximately 165 million shares in the free float in MMTLP.

7. The CEO's of TRCH and MMAT (who spun off MMTLP) have been charged by the SEC and are on trial in Texas in a civil case brought by the SEC.

8. The SEC states there is an ongoing investigation into MMTLP's trading and that subpoenas have gone out.

The Supreme Court's "major questions doctrine" further constrains agencies. "[W]e presume that Congress intends to make major policy decisions itself, not leave those decisions to

8

agencies." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). And as *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), clarified: "An agency may act only pursuant to authority delegated to it by Congress. … Courts must not defer to agency interpretations where Congress has not clearly spoken." Id. at 2257. No statute clearly authorizes an indefinite U3 halt that results in the security being cancelled, with huge losses by investors, with no noteworthy judicial review save for dismissing suits under the onerous burdens of the Private Securities Litigation Reform Act's (15 USCS 77 et. seq.) requirements for scienter, heightened pleading standards, and a host of other laws brutally enforced and aimed specifically at depriving US citizens access to the courts and discovery.

**Part V. Public Interest and Dodd-Frank's Transparency Mandates**

Congress enacted Dodd-Frank "to promote the financial stability of the United States by improving accountability and transparency in the financial system…" Pub. L. 111-203, Preamble (2010). Congress further mandated that the Consumer Financial Protection Bureau (CFPB) and related regulators ensure that "markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). By withholding blue sheets and Consolidated Audit Trail data, the SEC and FINRA have violated this statutory transparency mandate and denied investors the very information that would allow them to assess whether their losses were the result of lawful market activity or improper manipulation.

This statutory transparency mandate cannot be divorced from constitutional constraints. Where Congress has required the SEC to promote fairness and openness, the agency has no discretion to pursue secrecy or to tolerate actions that strip investors of their property without compensation or process. The Second Circuit explained in *Birnbaum v. United States*:

9

"We state our conclusions in summary form. We hold: (1) that a discretionary function can only be one within the scope of authority of an agency or an official, as delegated by statute, regulation, or jurisdictional grant; (2) that the CIA's legislative charter gave the Agency no authority to gather intelligence on domestic matters; (3) that the Agency's partnership with the FBI in the mail opening project led it to transgress the limitations of its charter; and (4) that there was no 'discretion' to engage in these mail opening activities, so that the discretionary function exception does not apply." *Birnbaum v. United States*, 588 F.2d 319, 329 (2d Cir. 1978).

The analogy is plain. Just as the CIA and FBI together transgressed statutory limits and constitutional boundaries in *Birnbaum*, so too did the SEC and FINRA by jointly sustaining the indefinite MMTLP halt. The Exchange Act grants the SEC only ten days to suspend trading. *SEC v. Sloan*, 436 U.S. 103, 112–14 (1978). FINRA has no congressional charter to impose or extend such halts indefinitely, let alone to cancel securities outright. By acting in concert—FINRA imposing the halt and the SEC permitting it to persist for over two years—both entities exceeded their lawful authority.

The D.C. Circuit has confirmed that the discretionary function exception does not extend so far. As it held in *Loumiet v. United States*, "As we have previously recognized, constitutionally ultra vires conduct cannot be discretionary." 948 F.3d 376, 382 (D.C. Cir. 2020). This principle forecloses the SEC's attempt to invoke sovereign immunity: there is no discretion to act unconstitutionally, and no immunity for ultra vires conduct.

Accordingly, the SEC's reliance on sovereign immunity must fail. The indefinite MMTLP halt was unauthorized under statute, unconstitutional in its effect, and perpetuated by joint agency action. Sovereign immunity cannot shield the SEC from judicial review where its

actions—like those of the CIA and FBI in *Birnbaum*—fall outside lawful authority and transgress constitutional limits.

**Part VI. Motion to Dismiss Must Be Deferred Pending Mandamus Disclosure**

The SEC's request for dismissal before producing records is therefore premature. As the Court stressed in *Camp v. Pitts*, 411 U.S. 138 (1973): "In dealing with a review of an administrative decision, it was held that the record on file had to be provided to the court." Plaintiff here says this component of the APA has been completely ignored by all of the court rulings thus far against litigants trying to get to the truth first and compensation later for what actually transpired in the trading of MMTLP and the internal correspondence held at both FINRA and the SEC. FOIA requests have been almost completely ignored. So here we are: The appropriate standard for review was, accordingly, whether the Comptroller's adjudication was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," as specified in 5 U. S. C. § 706 (2)(A). In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court. *Camp* at 142.

**Part VII. The U3 Halt Was an Unconstitutional Taking and Denied Due Process**

The U3 halt extinguished valuable property rights without procedure or compensation. Due process was likewise denied. "This Court consistently has held that some form of hearing is required before an individual is finally deprived of a property interest. *Wolff v. McDonnell*, 418 U.S. 539, 557-558 (1974). See, e.g., *Phillips v. Commissioner*, 283 U.S. 589, 596-597 (1931). See also *Dent v. West Virginia*, 129 U.S. 114, 124-125 (1889). The right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society. *Joint Anti-Fascist Comm.*

*v. McGrath,* 341 U.S. 123, 168 (1951) (Frankfurter, J., concurring). The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). See *Grannis v. Ordean*, 234 U.S. 385, 394 (1914).The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). No such opportunity was provided before investors' securities were cancelled, and to see the SEC's stonewalling on FOIA's and FINRA hiding behind it's constitutionally dubious immunity makes the case for a writ of mandamus hearing in the Second Circuit all the more critical.

These takings and due process violations, combined with FINRA's unchecked power as an SRO, underscore why mandamus must issue in the Second Circuit.

**VIII. Without Waiving Prior Arguments on Sovereign Immunity, the U3 Halt and SEC's Failure to Overturn It Constitute Operational Negligence, Not Protected Discretion**

Without waiving or diminishing the earlier arguments concerning the unconstitutionality of sovereign immunity as applied to the SEC, there are additional authorities that call into question the SEC's refusal to act in the wake of FINRA's U3 halt. Referencing *Sloan* again, the Supreme Court held that Congress imposed a firm ten-day limit on any suspension of trading, rejecting the SEC's practice of rolling suspensions because Congress had "struck a balance between protecting investors and the importance of maintaining free and open markets." By permitting FINRA's U3 halt to continue indefinitely, the SEC enabled precisely the sort of indefinite suspension that *Sloan* forbids.

FINRA's imposition of the U3 halt was not a matter of sound policy judgment, but negligence and breaches of duty in execution. FINRA issued a corporate action notice with an incorrect distribution date, thereby creating the very "settlement issue" later cited as the basis for

12

the halt. It then compounded the error by telling brokers and investors that December 12 would be the final day of trading, only to shut down trading on December 9. These are not protected discretionary judgments; they are operational missteps that directly harmed investors.

The SEC had clear statutory authority under 15 U.S.C. § 78s(e)(1) to modify or disapprove FINRA's actions, yet failed to act. In *Alpine Securities Corp. v. FINRA*, No. 23-5129, slip op. at 15 (D.C. Cir. Nov. 22, 2024), the D.C. Circuit emphasized that "the result … is that FINRA can, without any SEC review of its decision on the merits, effectively decide who can trade securities under federal law." Judge Millett cautioned that such unchecked authority "likely violates the private nondelegation doctrine," and the court enjoined FINRA's action precisely because the SEC had not exercised oversight. The same principle applies here: allowing FINRA's indefinite halt without SEC correction represents a supervisory failure, not protected discretion.[4]

This distinction between policy and execution is well-established under Federal Tort Claims Act caselaw, and Plaintiff readily admits he is arguing in the following that the FTCA's negligence standards apply to people seeking monetary damages from the US government *should* be applied to a non-monetary damages claim also. In Plaintiff's current position it is noteworthy that in seeking a writ of mandamus, it appears that the US government's negligence in causing the U3 halt directly benefited a host of stock holders and large firms at the expense of smaller

---

[4] The SEC is complicit in this fiasco going all the way back to 2019 when a whistleblower (Jeff Davies, a Texas resident and investor) contacted the SEC about fraudulent activities in TRCH in that they truly were reporting outrageous amounts of oil in their wells while knowing they had none. Davies met with the SEC for 5 hours, and despite the voluminous evidence (that has now largely been leaked to the public and put in reported S-1s by Next Bridge Hydrocarbons Inc.) there was no oil or gas. The SEC allowed the fake company to go on trading and allowed the spinoff of the "oil assets" into NBH from TRCH and MMAT's merger. Pure negligence bordering on dereliction of duty.

13

"mom and pop" investors. Therein lies the stretch Plaintiff is making: if the FTCA is applied here, then the shareholders, by proving the SEC financially benefitted some shareholders (and shorters) by their actions, then a cross-claim exists against the SEC and those who benefitted from the SEC's malfeasance.

In *Indian Towing Co. v. United States*, 350 U.S. 61, 69 (1955), the Court held that once the government undertakes to operate a lighthouse, it must perform with due care; negligence in operation is as actionable as negligence of a private person. Likewise, in *Doe v. United States*, 838 F.2d 220, 223 (7th Cir. 1988), the court held that when the government assumed a duty to safeguard children in a military daycare, sovereign immunity did not bar claims for negligence in supervision, even though the underlying assaults were intentional torts.[5]

Federal courts have repeatedly pierced the discretionary function defense where negligence is operational rather than policy-driven.

These authorities collectively establish a consistent principle: sovereign immunity does not protect negligence in execution, failure to supervise, or breaches of duty once the government has undertaken a responsibility. FINRA's indefinite halt and the SEC's refusal to intervene fall squarely within this category. The halt exceeded the ten-day limitation in *Sloan*, was executed negligently in violation of FINRA's own rules, and was permitted to continue only

---

[5] The Supreme Court has long distinguished between protected "planning-level" discretion and unprotected "operational" negligence. In *Dalehite v. United States*, the Court explained that the discretionary function exception "includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." 346 U.S. 15, 35–36 (1953). But the Court cautioned that "[i]t does not mean that every act of negligence in carrying out a program is excused." *Id.* at 36. The Court emphasized that the only decisions deemed shielded there were "all responsibly made at a planning rather than operational level." *Id.* at 42. Thus, even if this Court were to find that *Sloan* does not directly control, the SEC's failure to supervise FINRA's U3 halt is properly understood as operational negligence in executing its statutory duties under 15 U.S.C. § 78s(e)(1), not a protected policy judgment.

14

because of the SEC's supervisory inaction. As in *Indian Towing* and *Doe*, these are operational wrongs, not discretionary judgments.

In a case of a lawsuit against the SEC, the court held that "The Federal Tort Claims Act (FTCA) provides for a waiver of sovereign immunity for certain claims for damages arising from the tortious conduct of federal officers or employees acting within the scope of their office or employment. See 28 U.S.C. §§ 1346(b)(1), 2680. The proper defendant in an FTCA claim is the United States, not individual federal . . . agencies; *Holliday v. Augustine*, No. 3:14-cv-00855, 2015 U.S. Dist. LEXIS 2391, 2015 WL 136545, at *1 (D. Conn. Jan. 9, 2015); *Mignogna v. Sair Aviation, Inc.*, 937 F.2d 37, 40 (2d Cir. 1991). The Court therefore construes Plaintiff's claims for damages against the SEC as ones brought under the FTCA against the United States of America. *Pandya v. SEC* 1:23-cv-11180 (JLR) (2024). Plaintiff contends if merely changing the SEC to "United States" in any dismissal of this action allows him to proceed with an FTCA claim later, then judicial and real litigational economy dictates that the mandamus claims be heard first and foremost.

Accordingly, the continuation of the U3 halt beyond the statutory limit, combined with FINRA's negligence and the SEC's breach of its supervisory duty, fall outside the scope of sovereign immunity. These errors must be adjudicated, and sovereign immunity cannot be invoked to bar this Court's review.

**Conclusion and Prayer for Relief**

For the foregoing reasons, Plaintiff respectfully requests that this Court deny the SEC's motion to dismiss, reject the SEC's opposition to transfer, and transfer this matter in its entirety to the United States Court of Appeals for the Second Circuit under 28 U.S.C. § 1631.

Dated: September 4th, 2025

Scott Traudt, *pro se*
191 Kibling Hill Road
Strafford, VT 05072

I hereby certify that a true copy of the foregoing was sent to respondent at the addresses delineated below either by 1st Class mail or via email on this 4th day of September, 2025.

SCOTT TRAUDT

**UNITED STATES OF AMERICA,** Michael P. Drescher, Asst. US Attorney POB 570, Burlington, VT 05402-0570 by Lauren Almquist Lively, (Lauren.Lively@usdoj.gov)

**Securities and Exchange Commission,** Michael Bailey, 100 F Street, NE Washington, DC 20549 BaileyM@SEC.gov